IN RE COMPLAINT AGAINST JUDGE HARPER.

[Cite as *In re Complaint Against Harper* (1996), 77 Ohio St.3d 211.]

(No. 96–1551—Submitted September 3, 1996—Decided December 5, 1996.)

212

214

*Geoffrey Stern,* Disciplinary Counsel, *Alvin E. Mathews* and *Harold F. Craig III,* Assistant Disciplinary Counsel, for relator.

*John C. Nemeth & Associates, John C. Nemeth* and *David A. Herd,* for respondent.

---

BROGAN, C.J. Respondent has objected to the board's recommendation, and raises the following four propositions of law:

"[I]   The Board of Commissioners improperly reviewed this proceeding after the unanimous panel recommendation of dismissal.

"[II]   The Board of Commissioners incorrectly found that Respondent's campaign television commercial undermined public confidence in the judiciary, when there was no evidence presented by Relator indicating any effect on public opinion or confidence.

"[III]   Given Respondent's core political speech protections, under the United States Constitution, Canons 7B(1)(a) and 2A of the Code of Judicial Conduct are overbroad both facially and as applied to Respondent, and are too vague to have reasonably informed Respondent of what conduct or speech is intended to be precluded.

"[IV]   The Board of Commissioners improperly focused on the graphic art display of an obviously facetious check in reaching its recommendation, when such display is afforded the same constitutional protection as the rest of Respondent's speech."

With the above background in mind, we now turn to consideration of the propositions of law advanced by Judge Harper.

## I

Before addressing the first proposition of law, we note as a starting point for analysis that the proper standard in disciplinary cases is that the Supreme Court, not the board, "makes the ultimate conclusion, both as to the facts and as to the action, if any, that should be taken." *Cincinnati Bar Assn. v. Heitzler* (1972), 32 Ohio St.2d 214, 220, 61 O.O.2d 451, 454, 291 N.E.2d 477, 482, certiorari denied (1973), 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687.  Specifically, as indicated in *Heitzler:*

" 'In cases of this kind, the board of commissioners acts for and on behalf of this court. In doing so, it makes recommendations as to the facts which should be found and the action which should be taken by this court. However, this court has full responsibility for determining what the facts are and what action should be taken on those facts.' " *Id.*, quoting *Mahoning Cty. Bar Assn. v. Ruffalo* (1964), 176 Ohio St. 263, 27 O.O.2d 161, 199 N.E.2d 396.

Therefore, in assessing the propriety of the conduct in question and the appropriate sanction, if any, we are not bound by either the panel's or the board's conclusions as to fact or law.

Judge Harper's first proposition is that the board improperly reviewed this matter after the panel unanimously recommended dismissal. We do not agree. In this context, Judge Harper's contention is that any disciplinary action must be dismissed if a unanimous panel recommends dismissal. However, under Gov.Bar R. V(6)(H) and (I), the panel may order dismissal if it finds the evidence insufficient to support a charge or it may file its certified report of the proceedings in accordance with Gov.Bar R. V(6)(J). In the latter event, the board then reviews the matter and may refer it back to the panel for further evidence, take evidence before the board, or proceed on the certified report.

In the present case, the panel did not order dismissal and notify all interested parties, including Judge Harper's local bar association, the bar association of the county where the complaint arose, and the Ohio State Bar Association, as specified in Gov.Bar R. V(6)(H). Instead, the panel filed its findings and the board then proceeded on the certified report, in accordance with Gov.Bar R. V(6)(J). Moreover, as relator has pointed out, the language used by the panel did not order actions, but merely recommended that the charges be dismissed. Consequently, the board's review of this matter was proper, and respondent's first proposition is without merit.

## II

In her second proposition of law, Judge Harper argues that evidence of public opinion must have been presented before the board could find that the television campaign undermined public confidence in the judiciary. Again, we disagree, concluding that evidence of public opinion polls is not required to establish a finding that a judge has acted in a manner that diminishes public confidence in the judiciary.

In this regard, Canon 2A provides:

"A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

The single authority cited to support Judge Harper's position is *Ibanez v. Florida Dept. of Business & Professional Regulation* (1994), 512 U.S. 136, 114 S.Ct. 2084, 129 L.Ed.2d 118. In that case, an attorney who was also a certified public accountant was sanctioned by the state for using the term "CFP" (certified financial planner) next to her name in advertising. *Id.* at 141–142, 114 S.Ct. at 2088, 129 L.Ed.2d at 125. The state's position was that although the attorney actually had obtained the CFP designation, the use of "CFP" misled the public into believing that state approval and recognition existed for the designation. 512 U.S. at 143–144, 114 S.Ct. at 2089, 129 L.Ed.2d at 127. In rejecting the state's position, the Supreme Court noted that in the complete absence of any evidence of deception, concern about the possibility of deception in hypothetical cases is not sufficient to rebut the constitutional presumption favoring disclosure over concealment. 512 U.S. at 144–145, 114 S.Ct. at 2090, 129 L.Ed.2d at 127–128. Moreover, in a footnote, the court further observed that no witness had testified, nor had any evidence been offered, that any member of the public had been misled. 512 U.S. at 145, 114 S.Ct. at 2090, 129 L.Ed.2d at 128, fn. 10.

We do not read these comments as requiring the state to offer evidence of public opinion polls, nor do we believe that the state must offer testimony from witnesses who claim to have been misled. In reviewing *Ibanez,* the reason for the Supreme Court's statement is obvious. Given the innocuous nature of the initials "CFP," which have no objectively deceptive connotation, evidence that the public, in fact, was misled would have been helpful. However, no such difficulty presents itself in the case at hand, since the language used is readily susceptible of interpretation by an objective observer, without resort to proof from members of the public.

As a further point, we note that our examination of disciplinary cases from this, as well as from other jurisdictions, does not reveal the use of public opinion polls or outside testimony to establish violations pertaining to public confidence in the judiciary. For example, no evidence from the public or opinion surveys was required to establish Canon 2A violations in *Disciplinary Counsel v. Mosely* (1994), 69 Ohio St.3d 401, 632 N.E.2d 1287 (Canon 2A violation found based on indictment and conviction for grand theft based on acts while in office), and *Disciplinary Counsel v. Campbell* (1993), 68 Ohio St.3d 7, 623 N.E.2d 24 (Canon 2A violation found based on complaints of unwelcome or offensive sexual remarks and/or physical contact by judge). Likewise, in *Ohio State Bar Assn. v. Mayer* (1978), 54 Ohio St.2d 431, 8 O.O.3d 434, 377 N.E.2d 770, the court concluded that references to a fellow judge, among other things, as a liar, in conversations and public meetings, violated Canon 2A. There is no indication in that case that any testimony or evidence was taken from an outside source, *i.e.,* the general public.

Also of interest are the comments in *Mayer* construing R.C. 2701.12, then Gov.Bar R. VI (relating to suspension of judges for conduct that would bring the judicial office into disrepute), and the burden of proof required for a finding of misconduct warranting suspension or removal of a judge.[2]   R.C. 2701.12 lists several causes for removal or suspension, including "violation of such of the canons of judicial ethics adopted by the supreme court as would result in a substantial loss of public respect for the office."   R.C. 2701.12(A)(1).   In *Mayer*, the appellant argued that the commission had erred in applying a lesser standard of proof than was appropriate.   However, the Supreme Court rejected this argument, agreeing with the commission that the relator did not need to prove that " 'respondent's conduct would *"in fact"* result in a substantial loss of public respect or disrepute for the office,' "   *i.e.,* there was no need to prove actual loss of public respect.   (Emphasis in original.)   54 Ohio St.2d at 437–438, 8 O.O.3d at 437, 377 N.E.2d at 774.   Moreover, the evidence from which the commission and the Supreme Court drew the findings of Canon violations by clear and convincing evidence was not, as we noted above, dependent on testimony from members of the public who stated that the actions in question caused them to lose respect for the judiciary.

Applying this discussion to the present case, what Judge Harper asks is that we apply the "in fact" or "actual loss" standard rejected in *Mayer*.   This, we believe, would be inappropriate.   What is apparent from the cases is that an objective standard should be applied, or in other words, inappropriate actions include "conduct which would appear to an objective observer to be not only unjudicial but prejudicial to public esteem for the judicial office."   (Citation omitted.)   *In re Inquiry Concerning Baker* (Miss.1988), 535 So.2d 47, 51.   In reality, this is the standard courts have applied, but perhaps have not always specifically articulated, since common sense dictates that where a violation is subtle, more proof is needed.   Thus, the need for greater evidence is obvious in *Ibanez*, as the alleged violation hinged on the use of a set of initials with no apparent improper meaning.   By the same token, objective observers would agree, without further proof, that confidence in the judiciary is undermined when a judge is indicted on several counts of grand theft while in office and is convicted after a plea of no contest to those charges.   *Mosely,* 69 Ohio St.3d at 402, 632 N.E.2d at 1287.

Based on the foregoing analysis, we conclude that relator was not required to submit evidence that public confidence in the integrity and impartiality of the judiciary was, in fact, undermined.   However, even if this type of proof were

---

2.   The portion of Gov.Bar R. VI at issue in *Mayer* uses the same language as current Gov.Jud.R. III(1)(C)(3), permitting removal or suspension of judges for engaging in conduct that would bring the judicial office into disrepute.

required, we find that relator has met the burden. Specifically, Moore, an attorney from Columbus with no apparent connection to Justice Resnick, saw the ad and wrote a letter of complaint to the Supreme Court. Moore testified about his reaction to the ad, and the only conclusion to be drawn from his testimony is that he felt the ad was demeaning both to lawyers and the judiciary. Accordingly, we find respondent's second proposition of law to be without merit.

## III

In her third proposition of law, Judge Harper contends that Canons 7B(1)(a) and 2A are overbroad facially and as applied, and are too vague to have reasonably informed her of what speech or conduct was precluded. In support of this proposition, Judge Harper makes several additional points: (1) the language of the Canons in question is hortatory or advisory only, in view of the use of the words "should," rather than "shall"; (2) the state's interest in protecting the integrity of the judiciary is insufficient to impose restrictions on the right of free speech; (3) under existing law, she can be disciplined only if the statements in question are false; and (4) the Canons are overbroad, both facially, and as applied. Each of these arguments will be addressed separately.

First, with regard to the issue of the mandatory nature of the Canons, we note that the preface of the Canons indicates that they "establish mandatory standards unless otherwise indicated." In this context, it is noteworthy that all the Canons use the term "should" except Canon 4, which uses the term "may." We also note that this court has consistently applied the Canons in question to the conduct of judges, which illustrates that the Canons are felt to be binding on the conduct and speech of judges. See, *e.g., Campbell,* 68 Ohio St.3d 7, 623 N.E.2d 24 (finding violation of Canon 2A, among others). In that case, the court made the following comment:

"The Code of Professional Responsibility and the Code of Judicial Conduct serve many purposes. Foremost among them are to ensure a legal system of the highest caliber and to instill and maintain public confidence in that system." 68 Ohio St.3d at 11, 623 N.E.2d at 27.

Additionally, in a case decided shortly after the Canons of Judicial Ethics were adopted in 1954, the Supreme Court noted that it had declared the Canons " ' * * * binding upon all members admitted to practice law in the state of Ohio.' " *Mahoning Cty. Bar Assn. v. Franko* (1958), 168 Ohio St. 17, 21, 5 O.O.2d 282, 284, 151 N.E.2d 17, 21, certiorari denied (1959), 358 U.S. 932, 79 S.Ct. 312, 3 L.Ed.2d 305. The Supreme Court then commented:

"So much has been said and written about the honor, dignity, duties, responsibilities and standard of conduct generally expected of the legal profession that to expound thereon here would only be to repeat that which has already been well

said many times. The fact remains, however, that a person who attains the honor and dignity of being a member of the legal profession necessarily renders himself subject to the duties and responsibilities thereof." 168 Ohio St. at 22, 5 O.O.2d at 285, 151 N.E.2d at 22. The court further made this observation:

"It follows that the requirement by the Supreme Court of Ohio that attorneys who are judges *shall* adhere to a specialized code of ethics, *i.e.,* the Canons of *Judicial* Ethics, is in accord with the legislative intent that the judges of this state shall be persons who must adhere to the highest possible standard of ethical. conduct." (Emphasis in original.) 168 Ohio St. at 23, 5 O.O.2d at 285, 151 N.E.2d at 23. See, also, *Cuyahoga Cty. Bd. of Mental Retardation v. Assn. of Cuyahoga Cty. Teachers of Trainable Retarded* (1975), 47 Ohio App.2d 28, 1 O.O.3d 168, 351 N.E.2d 777 (concluding that use of term "should" in Code of Judicial Conduct means that the conduct is mandatory).

In *Cuyahoga Cty. Bd. of Mental Retardation,* Chief Justice Leo Jackson of the Cuyahoga County Court of Appeals noted:

"In examining the Code of Judicial Conduct it is apparent that while the permissible guidelines are indicated by the use of the word 'may' the mandatory portions are set forth by the use of the word 'should.' This is entirely consistent with the plain meaning of a word which expresses an obligation or duty. See Black's Law Dictionary (4th ed. 1968); Webster's New World Dictionary (1963)." 47 Ohio App.2d at 33, 1 O.O.3d at 171, 351 N.E.2d at 782.

We therefore find that all of the Judicial Canons in the Code of Judicial Conduct, except Canon 4, establish mandatory standards of conduct for Ohio judges.

Having determined that the Canons are binding on judges, the next question is whether they impermissibly infringe on rights protected by the First Amendment, and whether they are constitutionally deficient in failing to provide fair notice of prohibited conduct to persons subject to their purview. Intertwined with these matters is the issue of whether only false statements can be the subject of discipline. Our analysis of the Canons and the relevant constitutional principles and authorities has persuaded us that Canon 2A and 7B(1)(a), as well as their application in this case, withstand scrutiny.

The wording of Canon 2A is set forth above, and requires that judges conduct themselves at all times in a manner promoting public confidence in the integrity and impartiality of the judiciary. In addition, Canon 7B(1)(a) states:

"An incumbent judge, or a candidate for judicial office: (a) should maintain the dignity appropriate to judicial office."

Specifically, respondent argues that these Canons are overbroad and vague, both facially and as applied to her in this case, because they seek to punish

constitutionally protected speech, including true statements that the board viewed as reflecting adversely on the character of Ohio's judiciary.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. Rockford* (1972), 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222, 227.

Vague laws may also trap the innocent by not providing fair warning. *Papachristou v. Jacksonville* (1972), 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110. Thus, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. *Coates v. Cincinnati* (1971), 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214; *Gregory v. Chicago* (1969), 394 U.S. 111, 117–118, 89 S.Ct. 946, 950, 22 L.Ed.2d 134, 139–140 (Black and Douglas, JJ., concurring). A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. See *Edwards v. South Carolina* (1963), 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697.

In view of the imprecision of language, we can never expect complete certainty from its use. It will always be true that fertile legal "imagination can conjure up hypothetical cases in which the meaning of * * * [disputed] terms will be in nice question." *Am. Communications Assn. v. Douds* (1950), 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925, 951.

When the vice of a statute is its vagueness, the litigant asserting the vagueness defense must demonstrate that the statute in question is vague as applied to the litigant's conduct without regard to its potentially vague application to others. *Parker v. Levy* (1974), 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439. A perfectly vague statute is one which provides "[no] ascertainable standard for inclusion and exclusion" and thus is vague in all its applications. *Smith v. Goguen* (1974), 415 U.S. 566, 578, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605, 615. For example, the ordinance in *Coates* made it illegal for "three or more persons to assemble * * * on any of the sidewalks * * * and there conduct themselves in a manner annoying to persons passing by." 402 U.S. at 611, 91 S.Ct. at 1686–1687, 29 L.Ed.2d at 216, fn. 1. The "annoying" criterion is not vague merely in the sense that it is "an imprecise but comprehensible normative standard"; instead, it specifies *no standard at all* because one may *never* know in advance what "annoys some people [but] does not annoy others." 402 U.S. at 614, 91 S.Ct. at 1688, 29 L.Ed.2d at 217. As a matter of due process, a law is void on its face if it is so vague that persons "of common intelligence must necessarily guess at its

meaning and differ as to its application." *Connally v. Gen. Constr. Co.* (1926), 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328.

In the First Amendment area, the objectionable aspects of vagueness need not depend upon the absence of fair notice, for the First Amendment's demand for specificity is also a product of the concern for a statute's chilling effect. "Those * * * sensitive to the perils posed by * * * indefinite language, avoid the risk * * * only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited." *Baggett v. Bullitt* (1964), 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377, 385–386. As a consequence, the Supreme Court requires more specificity of a statute potentially applicable to expression sheltered by the First Amendment than in other contexts. *Smith,* 415 U.S. at 573, 94 S.Ct. at 1247, 39 L.Ed.2d at 612.

In the area of vagueness, we find instructive the analytical framework set forth in *Parker. Parker* involved, among other things, a challenge to the constitutionality of a regulation that punished commissioned officers for "conduct unbecoming an officer and a gentleman." 417 U.S. at 738, 94 S.Ct. at 2553, 41 L.Ed.2d at 447. Among the statements made were comments that Special Forces personnel were "liars and thieves," "killers of peasants," and "murderers of women and children." 417 U.S. at 739, 94 S.Ct. at 2553, 41 L.Ed.2d at 448, fn. 6.

The vagueness challenge in *Parker* is similar to Judge Harper's contention that the word "dignity" in Canon 7B(1)(a) and the content of the other Canons at issue in this case are too vague to furnish any appropriate means of guiding her conduct, thereby leaving silence as the only safe response. In *Parker,* the Supreme Court rejected this argument, based on several considerations. First, the court focused on the fact that the military was a " 'specialized community governed by a separate discipline from that of the civilian.' " (Citation omitted.) 417 U.S. at 744, 94 S.Ct. at 2556, 41 L.Ed.2d at 451. Next, the court emphasized the military's development of customs and usages that imparted meaning to the "seemingly imprecise" standards. 417 U.S. at 746–747, 94 S.Ct. at 2556, 41 L.Ed.2d at 452. Another pertinent distinction was the regulation of broad aspects of life unregulated in the civilian area, accompanied by sanctions "more akin to administrative or civil sanctions than to civilian criminal ones." 417 U.S. at 751, 94 S.Ct. at 2559, 41 L.Ed.2d at 455.

After making these observations, the Supreme Court concluded the provisions in the Uniform Code of Military Justice were not void for vagueness, given prior constructions that had narrowed their meaning. 417 U.S. at 753–754, 94 S.Ct. at 2560–2561, 41 L.Ed.2d at 456. The court also commented that "further content may be supplied even in these areas by less formalized custom and usage." 417 U.S. at 754, 94 S.Ct. at 2561, 41 L.Ed.2d at 457. Subsequent lower court decisions have applied *Parker 's* reasoning in nonmilitary contexts. See *Davis v.*

*Williams* (C.A.5, 1980), 617 F.2d 1100, certiorari denied (1980), 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (upholding constitutionality of fire department regulation prohibiting conduct prejudicial to good order), and *Vorbeck v. Schnicker* (C.A.8, 1981), 660 F.2d 1260, certiorari denied (1982), 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (declining jurisdiction because of lack of actual case and controversy, while indicating that police regulations, like military regulations, are generally cast in broad terms). But, cf., *Bence v. Breier* (C.A.7, 1974), 501 F.2d 1185, certiorari denied (1975), 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821.

In *Davis,* the court relied on both the *Parker* decision and *Arnett v. Kennedy* (1974), 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (upholding the constitutionality of civil service regulation allowing removal or suspension for "such cause as will promote the efficiency of the service"). In *Arnett,* the Supreme Court had previously emphasized:

" 'The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.' " (Citation omitted.) 416 U.S. at 159–160, 94 S.Ct. at 1647, 40 L.Ed.2d at 36.

Taking the above authorities into account, we find nothing unfair in the imposition of sanctions for violation of either Canon 7B(1)(a) or 2A. First and foremost, fair warning of the prohibited conduct existed in the form of an interpretative board opinion and preexisting case law cited in the opinion. Specifically, the board issued an advisory opinion in 1989 in response to the following question:

"How much negative criticism of an incumbent judge is permissible before such comments infringe on the dignity appropriate to that judicial office?" 1989 Ohio Bd. Commrs. on Grievances and Discipline, Op. 89–15. In response, the board commented:

"The threshold test to apply is whether the statements regarding an opponent are indeed truthful. * * * Once this is satisfied, there is a further requirement that the candidate must maintain the dignity appropriate to the office being sought. * * * This standard is not a precise one to apply; instead, it requires each candidate to exercise his or her own personal and professional judgment as to the implication and effect of the proposed criticisms." *Id.* at 5.

The board then stated:

"Some criticism of an opponent may be justifiable, as the Washington Supreme Court has held: '[a] candidate for judicial office has a right to challenge an incumbent judge's ability, decisions and judicial conduct, but it must be done

fairly, accurately and upon facts, not false representations.' *In re Donahue* [ (1978), 90 Wash.2d 173, 180], 580 P.2d 1093, 1097 [*sic, Donohoe* ].

"Furthermore, one commentator has stated that '[i]f running for judicial office, a lawyer may criticize an incumbent judge who is his opponent—but the criticism must be well founded, on a high plane, factual[,] and not personal.' R. Wise, *Legal Ethics* 21 (1966)." *Id.*

Additionally, like the military, fire and police departments, and civil service, the judiciary is a specialized community governed by a specific discipline and body of rules. Further, sanctions like public reprimands, that are applied for violation of the Canons of Judicial Ethics, are more civil or administrative than criminal. Custom and usage also aid in informing attorneys and judges of appropriate conduct, as is revealed through the Supreme Court's observation many years ago about the knowledge of permissible conduct an experienced attorney would possess. *In re Thatcher* (1909), 80 Ohio St. 492, 669, 89 N.E. 39, 88.

Accordingly, because Canons 2A and 7B(1)(a) provided reasonable opportunity for regulated persons to know what conduct was prohibited, and were also explicit enough to prevent arbitrary enforcement, they are not subject to attack under the vagueness doctrine.

Next, with respect to overbreadth, such a challenge is predicated on the proposition that a "clear and precise enactment may * * * be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned,* 408 U.S. at 114, 92 S.Ct. at 2302, 33 L.Ed.2d at 231. In addressing an overbreadth challenge, the "crucial question * * * is whether the [legislation] sweeps within its prohibitions what may not be punished under the First * * * Amendment[ ]." 408 U.S. at 114–115, 92 S.Ct. at 2302, 33 L.Ed.2d at 231.

Overbreadth is avoided if the regulation or legislation in question may be narrowed by reasonable construction, including interpretation by the agency responsible for enforcement. See *United States Civ. Serv. Comm. v. Natl. Assn. of Letter Carriers* (1973), 413 U.S. 548, 580, 93 S.Ct. 2880, 2897–2898, 37 L.Ed.2d 796, 817 (rejecting overbreadth attack on prohibition against employees taking active part in political campaign, based on, among other things, construction of statute by civil service commission and availability of procedure by which employee might obtain advice from the commission about the meaning of the law). See, also, *e.g., Stretton v. Disciplinary Bd. of Supreme Court of Pennsylvania* (C.A.3, 1991), 944 F.2d 137 (interpreting Canon 7 narrowly and rejecting overbreadth challenge).

The beginning focus for analysis in the present context, then, is Ohio law and any relevant interpretations of the board of commissioners. At the outset, we observe that many years ago, the Supreme Court approved the right of attorneys to criticize the judgments and conduct of judges during an election campaign, but

emphasized that the criticism must be done in a decent and respectful manner. See *In re Thatcher* (disbarring attorney for comments made about judge during reelection campaign). In *Thatcher,* the court rejected the attorney's free-speech claims, commenting that "[a]n attorney of more than twenty years' standing at the bar must be presumed to know the difference between respectful, fair, and candid criticism, and scandalous abuse of the courts * * *." *Id.,* 80 Ohio St. at 669, 89 N.E. at 88.

The comments in *Thatcher* were obviously more egregious than those in the present case, but on the other hand, disbarment, not simply a reprimand, was at issue. We do note that among the objectionable statements in *Thatcher* were allegations to the effect that the judge would decide cases in favor of persons who had financed him politically. See *id.* at 571–576, 89 N.E. at 69–70.

At the time *Thatcher* was decided, Ohio did not have canons of judicial ethics, but they were subsequently adopted in 1954. In addition, Gov.Bar R. V(2)(C) has been adopted, and affords interested parties an opportunity to obtain advice from the board about proposed conduct. In this vein, the board issued the advisory opinion previously cited, which provided guidance for candidates considering criticizing opponents in an election campaign.

We recognize that a speaker cannot be punished because of his or her viewpoint or message unless the restriction is necessary to promote a compelling government interest. *Simon & Schuster, Inc. v. New York Crime Victims Bd.* (1991), 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476. Content-based restrictions receive a high level of judicial scrutiny and will be upheld only if they are *narrowly drawn* to achieve "an important or substantial governmental interest [that] * * * is unrelated to the suppression of free expression." *United States v. O'Brien* (1968), 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, 680.

Although respondent agrees that the state has a compelling interest in protecting public confidence in the integrity of the judiciary, she is not willing to concede that this compelling interest overrides her right to publish truthful criticism of a Supreme Court justice. She argues that to the extent the Canons are interpreted to prevent truthful criticism of the judiciary, they are unconstitutionally overbroad. We wholeheartedly agree, but also conclude that the Canons do not prohibit truthful criticism, so long as the criticism is done fairly, accurately, and upon facts, not false representations. Accordingly, given the construction that truthful criticism of the judiciary in a dignified manner is not sanctionable, the Canons are not overbroad.

While reaching this conclusion adverse to respondent, we also stress that criticism of the judiciary has an important function in our society. For example, in *Bridges v. California* (1941), 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, the United States Supreme Court reversed the contempt convictions of a newspaper

editor and a labor leader for their remarks in editorials commenting on cases pending in a state court. The court held the convictions violated the First Amendment, even though the substantive evils asserted to support the contempt convictions were disrespect for the judiciary and disorderly and unfair administration of justice. While we recognize that *Bridges* is not directly on point, we do find the following language from the opinion worth emphasizing:

"The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind * * * on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." 314 U.S. at 270–271, 62 S.Ct. at 197, 86 L.Ed. at 207. Again, the Canons do not, and should not preclude criticism of the judiciary. However, that criticism must be tempered in the manner outlined above.

Pertinent in this context is the case of *In re Kaiser* (1988), 111 Wash.2d 275, 759 P.2d 392, in which the Washington Supreme Court held that Canons 1, 2(A) and 7B(1)(a) were violated when an incumbent judge made the following campaign statements:

"JUDGE KAISER IS TOUGH ON DRUNK DRIVING ... Will Roarty, the opponent, receives the majority of his financial support from drunk driving defense attorneys, whose primary interests are getting their clients off. * * *

"My opponent, Will Roarty, has received the majority of his financial contributions from *drunk driving defense attorneys*. This is the only group involved with Northeast District Court not supporting my reelection.

"The point is clear, I am a *tough, no-nonsense judge* and this group of attorneys wants to prevent my re-election." (Emphasis omitted in part.) *Id.* at 278, 759 P.2d at 394–395.

The court found these statements violative of the Canons because the statements suggested that justice is for sale and that certain defendants are not entitled to a fair trial. The court further found that the statements regarding contributions by DWI defense attorneys violated the Canons by calling into question the integrity and impartiality of the judiciary. Specifically, the court stated:

"Judge Kaiser suggested that, if elected, Roarty would not fairly and impartially apply the law to DWI defendants. He suggested that certain attorneys could and did buy favorable treatment for their clients, a class of defendants for whom there is little public sympathy. He suggested there is something improper about attorneys contributing to a judicial campaign when, of course, such contributions

are entirely proper." *Id.* at 282, 759 P.2d at 396. The court in *Kaiser* also found that the Canons in question as applied to Kaiser's statement were constitutionally valid because the statements had a direct detrimental effect on the compelling state interest of protecting the integrity of the judiciary. *Id.* at 289, 759 P.2d at 400.

Additionally, in *Berger v. Supreme Court of Ohio* (S.D.Ohio 1984), 598 F.Supp. 69, the federal district court rejected a constitutional challenge to Canon 7B(1)(c), which at that time restricted judges from announcing views on disputed legal issues, pledging or promising conduct in office, and making misrepresentations. The court first found a compelling state interest in regulating this area, stating:

"Plaintiff does not dispute that the state has a compelling interest in assuring that its elected judges are protected from untruthful criticism and that judicial campaigns are run in a manner so as not to damage the actual and perceived integrity of state judges and the bar; hence, the provision against misrepresentation. Additionally: [']Ours is an era in which members of the judiciary often are called upon to adjudicate cases squarely presenting hotly contested social or political issues. *The state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect.*[']" (Emphasis added.) *Id.* at 75, quoting *Morial v. Louisiana Judiciary Comm.* (C.A.5, 1977), 565 F.2d 295, 302.

The court then denied a request for preliminary injunction, finding that the regulation was necessary to achieve a compelling interest, but was not so unclear as to be attacked as void for vagueness. *Id.*

"[T]here is practically universal agreement that a major purpose of * * * [the First] Amendment was to protect the free discussion of governmental affairs, * * * of course * * * [including] discussions of candidates. *Mills v. Alabama* (1966), 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484, 488." "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *McIntyre v. Ohio Elections Comm.* (1995), 514 U.S. ——, ——, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426, 439–440.

We agree with the board that the record establishes that members of the Ohio Academy of Trial Lawyers as well as political action committees associated with the academy contributed in excess of $300,000 to Justice Resnick's 1994 campaign. There was nothing wrong with the respondent's informing the public that Justice Resnick received substantial contributions from this special interest group. Those who wished to go to the trouble could have examined Justice Resnick's campaign finance report filed with the Secretary of State and come to the same conclusion.

Further, the statement in the advertisement that "[T]his small group of suing lawyers wants Resnick with her liberal rulings to make it easier for them to collect millions in fees" is an expression of opinion by Judge Harper. Opinions are protected under the First Amendment. "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805.[3] By the same token, however, First Amendment protection does not adhere to statements of opinion that imply false assertions of fact. *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1, 17. As will be noted below, some of the statements in the ad implied false assertions of fact and were, therefore, inappropriate.

In view of the preceding analysis, which has revealed that Canons 2A and 7B(1)(a) are neither overbroad nor void for vagueness, we reject Judge Harper's third proposition.

## IV

As a final argument, respondent contends that the board improperly focused on the display of an obviously facetious check in reaching its recommendation for a public reprimand. We share the concerns expressed by the board about the video, which shows a check from the law firm of "Sue & Sue," and signed by "Cheatem Good." The check was pictured above a photograph of Justice Resnick. As was previously noted, the board concluded that the following reasonable conclusion followed from the totality of the ad:

"(1) Certain lawyers are dishonest.

"(2) One justice is associated with those lawyers.

"(3) There is something improper about lawyers contributing to a judicial campaign.

"(4) A justice appears to be the captive of one class of litigants, group of lawyers, or special interest."

Additionally, the board also concluded that these implications were either untrue or that Judge Harper had no information to support the innuendoes. We agree with this analysis. While the First Amendment allows for " 'rhetorical hyperbole,' " the comments in the advertisement were reasonably susceptible of

---

3. Parenthetically, we note that we also agree with the board that Judge Harper's opinion did not violate Canon 7B(1)(a), which prohibits candidates from expressing an opinion on a disputed legal issue.

an improper meaning and were not merely loose or figurative language. *Milkovich,* 497 U.S. at 17, 110 S.Ct. at 2705, 111 L.Ed.2d at 16–17.

The United States Supreme Court has recognized constitutional limits on the type of speech which may be the subject of state "defamation" actions. For example, in *Greenbelt Cooperative Publishing Assn. v. Bresler* (1970), 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6, the court held that statements that cannot reasonably be interpreted as stating actual facts about an individual are protected, thus assuring that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation," *Milkovich,* 497 U.S. at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 19. Therefore, in *Greenbelt,* the court reasoned that "the most careless reader must have perceived that the word [blackmail] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [an opponent's] negotiating position extremely unreasonable." 398 U.S. at 14, 90 S.Ct. at 1542, 26 L.Ed.2d at 15. Likewise, in *Hustler Magazine, Inc. v. Falwell* (1988), 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41, 48, the Supreme Court held that the First Amendment precluded recovery under a state's emotional distress action for an ad parody which "could not reasonably have been interpreted as stating actual facts about the public figure involved."

Applying these authorities to the present case, a viewer of respondent's political advertisement would not seriously believe that a law firm named "Sue & Sue" exists, nor would he or she believe there is actually a lawyer named "Cheatem Good." A reasonable member of the public could, nonetheless, have concluded from the advertisement that lawyers representing plaintiffs' interests are dishonest and that these dishonest lawyers desired Justice Resnick's reelection. However, contrary to the inferences in the ad, lawyers representing plaintiffs' interests provide a valuable contribution to the public. To the extent the advertisement suggested dishonest lawyers might find comfort in Justice Resnick's reelection, it undermined public confidence in the integrity and impartiality of the judiciary. Furthermore, by authorizing the advertisement, respondent failed to maintain the dignity appropriate to her judicial office.

We also agree with the board that the advertisement suggested there was something improper in lawyers' contributing to a judicial campaign. Again, this inaccurate representation also undermined public confidence in the integrity and impartiality of the judiciary.

Therefore, we find that by approving this campaign advertisement, respondent violated Canons 2A and 7B(1)(a). Accordingly, we must publicly reprimand the respondent. We do so, however, with great reluctance in light of the many years of distinguished service Judge Harper has given the citizens of this state.

*Judgment accordingly.*

HILDEBRANDT, WOLFF, HADLEY, ABELE, HOFFMAN, O'NEILL, BAIRD, BOWMAN and FORD, JJ., concur.

WALSH, J., concurs separately.

JAMES A. BROGAN, C.J., of the Ohio Courts of Appeals Judges Association, and of the Second Appellate District.

LEE H. HILDEBRANDT, JR., J., of the First Appellate District.

WILLIAM H. WOLFF, JR., J., of the Second Appellate District.

RONALD E. HADLEY, J., of the Third Appellate District.

PETER B. ABELE, J., of the Fourth Appellate District.

WILLIAM B. HOFFMAN, J., of the Fifth Appellate District.

JOSEPH E. O'NEILL, J., of the Seventh Appellate District.

WILLIAM R. BAIRD, J., of the Ninth Appellate District.

DONNA BOWMAN, J., of the Tenth Appellate District.

DONALD R. FORD, J., of the Eleventh Appellate District.

JAMES E. WALSH, J., of the Twelfth Appellate District.

WALSH, J., concurring. Having come to the conclusion that we, as judges, are accountable for what we approve to be done as much as we are for what we do, I, too, reluctantly join in the majority decision in this case. My reluctance stems from the circumstances of this case.

Judge Harper first viewed the subject television advertisement eight days prior to the election and was thus not given much time to reflect upon the advertisement prior to authorizing its airing. Eight days seems like a long time until one considers the lag time involved in making up a new television advertisement, distributing it, showing it, and the nearness of the upcoming election day to October 31, 1994, when Judge Harper first saw the advertisement. Additionally, funds had already been expended to make the subject television advertisement.

When Ohio Republican Party Chairman Robert Bennett invited Judge Harper to his office in Columbus to view the television commercial for the first time, the press of these circumstances had to be in the front of her mind. Also to be considered by her, after seeing it, was the wisdom of confronting Bennett concerning the poor judgment that went into designing this commercial, and whether she wanted, at this stage of the campaign, so to disagree with the state party chairman who had put her into this position.

By her failure to reject the advertisement, we are finding that Judge Harper violated Canons 2A and 7B(1)(a). But, this didn't happen in a vacuum. For that I am saddened by the resulting blemish on her otherwise successful career.