**Robert BUTLER, et al., Plaintiffs,**

v.

**The ALABAMA JUDICIAL INQUIRY COMMISSION, et al., Defendants.**

**No. Civ.A. 00–D–976–N.**

United States District Court,
M.D. Alabama,
Northern Division.

July 28, 2000.

James C. Barton, Jr., Johnston, Barton, Proctor & Powell, LLP, Birmingham, AL, Robert Marc Givhan, Johnston, Barton, Proctor & Powell, LLP, Birmingham, AL, for defendants.

William Joseph Baxley, Baxley, Dillard, Dauphin & McKnight, Birmingham, AL, Terry L. Butts, Cervera, Ralph & Butts, Troy, AL, Larry B. Childs, Walston, Wells, Anderson & Bains, LLP, Birmingham, AL, for plaintiffs.

### MEMORANDUM OPINION AND ORDER

DE·MENT, District Judge.

Before the court is Plaintiffs' Motion For Temporary Restraining Order ("Mot."), filed July 24, 2000, together with a brief in support thereof ("Pl.s' Br."). Defendants filed a Memorandum Of Law In Opposition To Plaintiffs' Motion ("Def.s' Mem.") on July 25, 2000. For the following reasons, the court finds that Plaintiffs' Motion For Temporary Restraining Order

is due to be granted in accordance with the terms and conditions set forth herein.

## I. JURISDICTION

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(3) (civil rights jurisdiction). The Parties do not contest personal jurisdiction or venue.

## II. BACKGROUND

Plaintiffs are Justice Harold F. See, Jr. ("Justice See"), an Associate Justice of the Supreme Court of Alabama (Compl.¶ 1); Judge W. Thomas Gaither ("Judge Gaither"), who "previously has served as a District Judge and Circuit Judge in the Third Judicial Circuit of Alabama," and who "is a potential future candidate for a judgeship" (*Id.* ¶¶ 1, 6); and Robert Butler ("Butler"), "a registered voter in the State of Alabama" who "participates as a voter in judicial elections in Alabama." (*Id.* ¶¶ 1, 7.) Defendants are the Alabama Judicial Inquiry Commission ("JIC"), JIC's Commissioner, Randall L. Cole, and the following seven members of the JIC: Norman E. Waldrop, Jr.; James M. White; P. Ben McLauchlin, Jr.; Lee E. Portis; David Scott; Greg Sullivan; and J. Mark White. (*Id.* ¶ 2.)

The Alabama Constitution of 1901, as amended, established the JIC and the Court of the Judiciary to enforce the Alabama Canons of Judicial Ethics. *See* ALA. CONST. of 1901, amend. 581, §§ 6.17 & 6.18. The Alabama Canons of Judicial Ethics, which were first adopted by the Supreme Court of Alabama in 1976, govern the character and conduct of judges in the State of Alabama and have the force and effect of law. *See* Alabama Canons of Judicial Ethics Preamble (effective February 1, 1976) ("The Supreme Court of Alabama ... adopts the ... Canons, as a code for judges and a declaration of that which the people of the State of Alabama have a right to expect of them.").

The JIC operates similar to a grand jury. Some of the constitutional duties of the JIC are as follows:

The [JIC] shall be convened permanently with authority to conduct investigations and receive or initiate complaints concerning any judge of a court of the judicial system of this state. The commission shall file a complaint with the Court of the Judiciary in the event that a majority of the members of the commission decide that a reasonable basis exists, ... to charge a judge with violation of any Canon of Judicial Ethics....

*See* ALA. CONST. of 1901, amend. 581, § 6.17(b).

The Court of the Judiciary, in turn, convenes to hear complaints filed by the JIC. The Court of the Judiciary has the "authority, after notice and public hearing ... to remove from office, suspend without pay, or censure a judge, or apply such other sanction as may [be] prescribed by law, for violation of a Canon of Judicial Ethics...." *Id.*, § 6.18(a).

A judge against whom the JIC has filed a complaint is prohibited by Amendment No. 328, § 6.19, to the Alabama Constitution of 1901 from serving as a judge until final resolution of the complaint by the Court of the Judiciary. *See* ALA. CONST. of 1901, amend. 328, § 6.19 (providing that "[a] judge shall be disqualified from acting as a judge" during the pendency of a complaint filed by the JIC); (Compl.¶ 17.)

This action arises from a complaint filed by the JIC against Justice See. Justice See currently serves as an Associate Justice on the Supreme Court of Alabama. His term as an Associate Justice expires in January 2003. (Compl.¶ 6.)

In the primary election held on June 6, 2000, Justice See sought the nomination of the Republican party for the highest position on the Supreme Court of Alabama, i.e., the office of Chief Justice. (*Id.*) Justice See was defeated by Judge Roy Moore ("Judge Moore") in the Republican primary election. Since his defeat, Justice See has continued to serve on the Supreme Court of Alabama in his incumbent position as an Associate Justice. However,

Justice See will have to run for re-election in 2002, assuming he desires to remain an Associate Justice. (*Id.*)

Prior to the June 6, 2000 primary election, Justice See actively campaigned. As part of his campaign, Justice See "ran a series of political advertisements on television and radio and in printed materials." (*Id.* ¶ 7.) As contended in the Complaint, Justice See's advertisements "briefly questioned the record" of Judge Moore. (*Id.*) According to Justice See, his criticisms of Judge Moore "were true and accurate." (*Id.*)

However, as alleged in the Complaint, in May 2000, the JIC received a complaint that Justice See's "advertisements pertaining to [Judge Moore's] record of sentencing in drug cases might be in violation of Canon 7B[(2)] of the Canons of Judicial Ethics." (*Id.* ¶ 11.) That Canon provides as follows:

> (2) *Campaign Communications.* During the course of any campaign for nomination or election to judicial office, a candidate shall not, by any means, do any of the following:
>
> Post, publish, broadcast, transmit, circulate, or distribute false information concerning a judicial candidate or an opponent, either knowing the information to be false or with reckless disregard of whether the information is false; or post, publish, broadcast, transmit, circulate, or distribute true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person.

Alabama Canons of Judicial Ethics Canon 7B(2) (effective Jan. 1, 1998); (Compl.¶ 12.)

Thereafter, on July 21, 2000, the JIC filed a three-count complaint with the Court of the Judiciary against Justice See. (Compl.¶ 15, Ex. A.) In general terms, the JIC's complaint alleges that, through his campaign advertisements, Justice See violated Canons 2A and 7B(2). Specifically, Count 1 charges that, during his judicial campaign, Justice See distributed "false information" about Judge Moore "either

knowing the information to be false or with reckless disregard of whether that information was false in violation of Canon 7B(2)." (Compl., Ex. A, ¶¶ 13–15.) Count 2 alleges that Justice See, "in the course of a judicial campaign," disseminated "information" about Judge Moore "knowing that the information would be deceiving or misleading to a reasonable person," in violation of Canon 7B(2). (Compl., Ex. A, ¶¶ 16–18.) Count 3 avers that, "in the course of a judicial campaign," Justice See "failed to respect and comply with the law and to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary," in violation of Canon 2A. (Compl., Ex. A, ¶ 19.) As set forth in Count 3, Justice See allegedly violated Canon 2A when he, "through his campaign spokesperson, criticized Moore's conduct in not explaining his sentences when an explanation by Moore would have been in violation of Canon 3A(6)." (*Id.*) As a result of the filing of the JIC's complaint, Justice See is disqualified "from acting as a judge" (Compl.¶ 17), pursuant to § 6.19 of Amendment No. 328 to the Alabama Constitution of 1901.

On July 24, 2000, Plaintiffs commenced this action by filing the instant Complaint in the United States District Court for the Middle District of Alabama. Plaintiffs claim that Canons 2A and 7B(2), as well as § 6.19 of Amendment No. 328 to the Alabama Constitution of 1901, violate their rights protected under the First Amendment to the United States Constitution, as applicable to the states through the Fourteenth Amendment. In their Complaint, Plaintiffs assert generally that

> [a] person does not surrender his constitutional right to freedom of speech when he becomes a candidate for judicial office. The statements made in Justice See's campaign advertisements are core political speech that enjoy the highest protection of the free speech clause of the First Amendment and the due process clause of the Fourteenth Amendment to the United States Constitution.

(*Id.* ¶ 18.)   More specifically, Plaintiffs assert that Canon 7B(2) "on its face is an overbroad and vague prior restraint that chills the free exercise of the right of truthful speech and deprives the citizens of Alabama of the right of full, fair and factual discussion of the qualifications of candidates for judicial office." (*Id.* ¶ 20.)   Further, Plaintiffs contend that Canon 7B(2) "chills the right of free speech of Justice See and Gaither and abridges the right of the citizens of Alabama, including Justice See, Gaither and Butler to receive information about other candidates for judicial office." (*Id.* ¶ 22.)

In their Complaint, Plaintiffs bring the following five counts against Defendants. In Counts 1 and 2, Plaintiffs set forth facial challenges to Canon 7B(2). Namely, in Count 1, Plaintiffs assert that Canon 7B(2) violates the First and Fourteenth amendments because it is "vague," "overbroad," "chills judicial candidates' free speech," and "deprives the voting public of useful information necessary to an informed choice in a judicial election." (*Id.* ¶ 27.)   In Count 2, Plaintiffs aver that Canon 7B(2) is "overbroad" and, thus, violates the First and Fourteenth amendments "in that [Canon 7B(2) ] precludes a judge who is a candidate for political office from making factual misstatements during the course of a political campaign when the judicial candidate is unaware of an inaccuracy." (*Id.* ¶ 30.)   In Count 3, Plaintiffs allege that Canon 2A, "as applied by JIC," abridges the First and Fourteenth amendments "insofar as it precludes a judge who is a candidate for political office from making truthful statements during the course of a political campaign." (*Id.* ¶ 32.)

Further, in Count 4, Plaintiffs assert that Canon 7B(2), "as applied by JIC," is in violation of the First and Fourteenth amendments "insofar as it precludes a judge who is a candidate for political office from making truthful statements or from making statements that he believes to be truthful during the course of a political campaign." (*Id.* ¶ 34.)   Finally, in Count 5, Plaintiffs raise the following challenge to § 6.19, of Amendment No. 328 of the Alabama Constitution of 1901:

> As applied to a complaint relating to free speech in an election campaign, § 6.19 of Alabama Constitutional Amendment No. 328, which disqualifies Justice See from serving as a Justice of the Supreme Court of Alabama upon the filing of a complaint by JIC, violates the First and Fourteenth Amendment rights of Justice See and deprives the citizens of Alabama of the right to the services of a duly elected state official of their choice.   The injuries to the rights of Justice See and the citizens of Alabama are irreparable and cannot be redressed by any proceeding.

(*Id.* ¶ 36.)

As relief, Plaintiffs move the court to "[d]eclare" the following: (1) that Canon 7B(2), on its face and as applied by the JIC, "violates the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983." (Compl. at 9); (2) that Canon 2(A), as applied, violates the First and Fourteenth amendments; and (3) that Amendment No. 328, § 6.19, to the Alabama Constitution of 1901, "as applied to disqualify Justice See from his duly elected office," violates the First and Fourteenth amendments and "that Justice See is duly entitled to continue his service as a Justice of the Supreme Court of Alabama." (*Id.*) Further, Plaintiffs request injunctive relief enjoining Defendants "from enforcing Canon 7B(2) or taking any other action to infringe upon the Constitutional rights of free speech in judicial elections" and "from prosecuting the complaint filed against Justice See in violation of his Constitutional rights." (*Id.*)

Seeking immediate relief, Plaintiffs simultaneously filed the instant Motion For A Temporary Restraining Order. Therein, Plaintiffs request that the court "immediately enjoin[ ] and restrain[ ]" Defendants "until hearing and thereafter until further order of this Court" from engaging in the following:

a) Enforcing or attempting to enforce Canon 7B(2) of the Alabama Canons of Judicial Ethics against Justice See or any other member of the Alabama judiciary;

b) Enforcing or attempting to enforce Canon 2A of the Alabama Canons of Judicial Ethics against Justice See or any other member of the Alabama judiciary in a like manner;

c) Prosecuting or attempting to prosecute the complaint against Justice See that [the JIC has] filed in the court of the judiciary;

d) Hindering or preventing Justice See from continuing to carry out his duties as a Justice of the Supreme Court of Alabama[.]

(Mot. at 3.)

### III. DISCUSSION

In their Motion, Plaintiffs seek a temporary restraining order enjoining the JIC from enforcing Canons 2(A) and 7B(2) of the Alabama Canons of Judicial Ethics, and Amendment No. 328, § 6.19, to the Alabama Constitution of 1901. Plaintiffs claim that the aforementioned two Canons and Amendment violate their rights protected under the First and Fourteenth amendments to the United States Constitution. These violations, according to Plaintiffs, justify the issuance of a temporary restraining order. For the reasons to follow, the court agrees with Plaintiffs, in part.

Before addressing the specific elements of proof for obtaining a temporary restraining order, the court notes that Defendants have questioned whether Judge Gaither and Butler have standing to bring this lawsuit. However, the court need not grapple with these issues at this early stage of the litigation because it is undisputed that Justice See does have standing and the relief requested by Justice See in the instant Motion encapsulates the relief sought by Judge Gaither and Butler.

Therefore, because the court finds that the relief requested by Justice See is due to be granted, *see infra* Part V, and said relief encapsulates the relief sought by Judge Gaither and Butler, the court concludes that the instant Motion is due to be denied as moot with respect to Judge Gaither and Butler. Consequently, while the court hereinafter refers to the movants collectively as "Plaintiffs," the court only addresses Plaintiffs' Motion For A Temporary Restraining Order as it applies to Justice See.

The purpose of a temporary restraining order, like a preliminary injunction, is to protect the movant from irreparable injury and to preserve the status quo until the district court renders a meaningful decision on the merits. *See Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).[1] A plaintiff seeking a temporary restraining order must establish that:

(1) there is a substantial likelihood that the moving party will prevail on the merits;

(2) the moving party will suffer irreparable injury if the injunction is not granted;

(3) the threatened injury to the moving party outweighs the threatened harm the proposed injunction may cause the opposing party; and

(4) the injunction, if issued, would not be adverse to the public interest.

*Johnson v. U.S. Department of Agriculture,* 734 F.2d 774, 781 (11th Cir.1984); *see also United States v. Metropolitan Dade County,* 815 F.Supp. 1475, 1477 (S.D.Fla. 1993) (setting forth the elements of a temporary restraining order and noting that the standard of review for a temporary restraining order is the same as the standard of review for a preliminary injunction); FED.R.CIV.P. 65(b). The first element is generally regarded as the most

---

1. Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

important because the granting of a temporary restraining order would be inequitable if the movant has no chance of succeeding on the merits of the case. *See Callaway*, 489 F.2d at 576; *Gonzalez v. Reno*, No. 00–11424–D, 2000 WL 381901, at *1 (11th Cir. April 19, 2000). The last three elements essentially require the court to balance the equities of the matter in dispute in order to "choose the course of action that will minimize the costs of being mistaken." *American Hospital Supply v. Hospital Products, Ltd.*, 780 F.2d 589, 593 (7th Cir.1986); *see also Clark Constr. Co. v. Pena*, 930 F.Supp. 1470, 1477 (M.D.Ala. 1996). Ultimately, the decision to grant or deny a temporary restraining order is within the "sound discretion of the district court." *Sierra Club v. Georgia Power Co.*, 180 F.3d 1309, 1310 (11th Cir.1999) (citing *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir.1983)). In light of the foregoing, the court now addresses Plaintiffs' Motion.

## A. *Likelihood of Success on the Merits*

■ Under the first requirement for obtaining a temporary restraining order, the court does not have to find that Plaintiffs have a substantial likelihood of success on every claim set forth in their Complaint. It is sufficient if the law or facts support a substantial likelihood of success on at least one claim that would sustain the issuance of a temporary restraining order. *See Atlanta School of Kayaking, Inc. v. Douglasville–Douglas County Water and Sewer Auth.*, 981 F.Supp. 1469, 1472 (N.D.Ga. 1997).

As discussed herein, the court finds that there is a substantial likelihood that Plaintiffs will prevail on at least one of their claims. In Counts 1 and 2, Plaintiffs raise a First Amendment facial challenge to Canon 7B(2). Plaintiffs assert, in part, that Canon 7B(2) is overbroad and, as a result, chills First Amendment speech. Further, in Count 5, Plaintiffs raise a challenge to the constitutionality of § 6.19 of Amendment No. 328 to the Alabama Constitution of 1901. The gravamen of Plaintiffs' complaint in Count 5 is that Justice

See has been punished for exercising his free speech rights because he has been removed from serving as an Associate Justice of the Supreme Court of Alabama based upon a JIC complaint alleging that he violated Canon 7B(2). Thus, according to Plaintiffs, § 6.19 of Amendment No. 328 to the Alabama Constitution of 1901, as applied to Justice See, imposes a penalty upon him for exercising his constitutionally protected free speech rights. For the reasons to follow, the court concludes that a substantial likelihood exists that Plaintiffs will succeed on their facial challenge to Canon 7B(2). Primarily, as explained below, the court finds that, pursuant to the overbreadth doctrine, there is a substantial likelihood that the following portion of Canon 7B(2) is not narrowly tailored to serve the state's compelling interest in maintaining the integrity of the judiciary: "During the course of any campaign for nomination or election to judicial office, a candidate shall not, by any means … post, publish, broadcast, transmit, circulate, or distribute true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person." Alabama Canons of Judicial Ethics Canon 7B(2).

### 1. Overbreadth Doctrine

■ "An overbreadth challenge is based on the statute's 'possible direct and indirect burdens on speech.'" *United States v. Acheson*, 195 F.3d 645, 650 (11th Cir.1999) (quoting *American Booksellers v. Webb*, 919 F.2d 1493, 1499–500 (11th Cir. 1990)). As explained in *Acheson*, "the overbreadth doctrine 'protects the public from the chilling effect such a statute has on protected speech; the court will strike down the statute even though in the case before the court the governmental entity enforced the statute against those engaged in unprotected activities.'" *Id.* (quoting *Nationalist Movement v. City of Cumming*, 934 F.2d 1482, 1485 (11th Cir.1991) (Tjoflat, J., dissenting)). Moreover, in the context of the First Amendment, "enforcement of a statute … placed at issue is

totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). As emphasized by the *Broadrick* Court, "[a]pplication of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Id.*

### 2. The First Amendment

The court cannot begin its analysis without first setting forth the fundamental tenants of First Amendment law in free speech cases. In the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court of the United States articulated the essence of the First Amendment's protections:

The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498. 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' *Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117. '(I)t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions,' *Bridges v. California*, 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192, and this opportunity is to

be afforded for 'vigorous advocacy' no less than 'abstract discussion.' *N.A.A.C.P. v. Button*, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed.2d 405. The First Amendment, said Judge Learned Hand, 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.' *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943). Mr. Justice Brandeis, in his concurring opinion in *Whitney v. California*, 274 U.S. 357, 375–376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, gave the principle its classic formulation:

'Those who won our independence believed *** that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.'

*Id.* at 270–71, 84 S.Ct. 710.

Moreover, particularly relevant to this case is the Supreme Court's discussion on the First Amendment in the context of elections found in *Brown v. Hartlage*, 456

U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982), from which the court now quotes:

At the core of the First Amendment are certain basic conceptions about the manner in which political discussion in a representative democracy should proceed. As we noted in *Mills v. Alabama,* 384 U.S. 214, 218–219, 86 S.Ct. 1434, 1436–1437, 16 L.Ed.2d 484 (1966):

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."

The free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy—the political campaign. "[I]f it be conceded that the First Amendment was 'fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 271–272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971) (citation omitted). The political candidate does not lose the protection of the First Amendment when he declares himself for public office. Quite to the contrary:

"The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day. Mr. Justice Brandeis' observation that in our country 'public discussion is a political duty,' *Whitney v. California,* 274 U.S. 357, 375 [47 S.Ct. 641, 648, 71 L.Ed. 1095] (1927) (concurring opinion), applies with special force to candidates for public office." *Buckley v. Valeo,* 424 U.S. 1, 52–53 [96 S.Ct. 612, 651, 46 L.Ed.2d 659] (1976) (per curiam).

*Id.* at 52–53, 102 S.Ct. 1523.

### 3. The Level of Scrutiny Applied in First Amendment Cases Involving Political Speech

■ The Supreme Court of the United States has held that content-based restrictions on speech, such as Canon 7B(2), are subject to "the most exacting scrutiny" allowed under law. *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *see also American Civil Liberties Union of Florida, Inc. v. The Florida Bar,* 744 F.Supp. 1094, 1097 (N.D.Fla. 1990) ("Where ... a regulation goes so far as to restrict speech because of its content, there is a strong presumption that the regulation is unconstitutional.") (citing *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)). Further, when, as here, "a State seeks to restrict directly the offer of ideas by a candidate to the voters, the First Amendment surely requires that the restriction be demonstrably supported by not only a legitimate interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression." *Brown,* 456 U.S. at 53–54, 102 S.Ct. 1523. In other words, to survive First Amendment strict scrutiny, the state is required to show, first, that the "regulation is necessary to serve a compelling state interest," and, second, that the regulation "is narrowly drawn to achieve that end." *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *accord Board*

*of Airport Comm'rs of Los Angeles v. Jews for Jesus,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); *cf. Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971) ("[I]t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."). In the area of political speech " 'so closely touching our most precious freedoms,' precision of regulation must be the touchstone." *Iowa Right to Life Committee, Inc. v. Williams,* 187 F.3d 963, 968 (8th Cir.1999) (quoting *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). Thus, "[a]mbiguity and uncertainty in a regulation compel a speaker 'to hedge and trim' and can invalidate the regulation." *Id.* at 969 (quoting *Buckley,* 424 U.S. at 43, 96 S.Ct. 612).

### 4. Application of Strict Scrutiny to Canon 7B(2)

#### (a) Is There a Compelling State Interest?

In this case, it is not disputed that preserving the integrity of the judiciary is a compelling state interest. *See Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 848, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) ("There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary.") (Stewart, J., concurring in the result); *see also Stretton v. Disciplinary Bd. of Supreme Court of Pennsylvania,* 944 F.2d 137, 142 (3rd Cir.1991) ("There can be no question ... that a state has a compelling interest in the integrity of its judiciary."); *In re Chmura,* 461 Mich. 517, 608 N.W.2d 31, 40 (2000) ("The state ... has a compelling interest in preserving the integrity of the judiciary."). Accordingly, the court concludes that the State of Alabama has a compelling interest in protecting the integrity of the judiciary.

#### (b) Is Canon 7B(2) Narrowly Tailored to Further the State's Compelling Interest?

■ The court finds that Plaintiffs have a substantial likelihood of succeeding at trial on their contention that Canon 7B(2) is not narrowly drafted and, thus, unnecessarily infringes upon their First Amendment rights. The court finds that the breadth of the language used in the latter part of Canon 7B(2) raises concerns as to the constitutionality of Canon 7B(2). Specifically, the court is referring to Canon 7B(2)'s prohibition on the dissemination of "true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person." *See* Alabama Canons of Judicial Ethics Canon 7B(2). As explained below, the court concludes that Plaintiffs are likely to be successful on the merits of their action to have this canon declared unconstitutionally overbroad under the First Amendment. The court reaches this conclusion based on several reasons.

First, the court finds the decision in *In re Chmura,* 461 Mich. 517, 608 N.W.2d 31 (2000), to be well reasoned and persuasive authority. In that case, the Supreme Court of Michigan confronted the issue of whether one of its Canons of Judicial Ethics could withstand constitutional scrutiny under the First Amendment's free speech clause. The canon at issue in *Chmura* was Canon 7(B)(1)(d) of the Michigan Code of Judicial Conduct, which provides that a candidate for judicial office

> should not use or participate in the use of any form of public communication that the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading, or which is likely to create an unjustified expectation about results the candidate can achieve.

*Id.* at 36 (quoting Michigan Code of Judicial Conduct, Canon 7(B)(1)(d)).

Applying strict scrutiny, the Supreme Court of Michigan held that the canon was "facially unconstitutional because it [was] not narrowly tailored to serve the state's compelling interest in maintaining the in-

tegrity of the election process and ensuring public confidence in the judiciary."[2] *Id.* at 38. In reaching its holding, the *Chmura* Court relied, in part, on the reasoning in *Brown v. Hartlage*, 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982), stating that:

> In *Brown* ..., the Supreme Court considered a Kentucky statute that voided an election because the victorious candidate had announced during his campaign that he intended to serve at a salary less than that fixed by law. The Court rejected the state's argument that its interest in protecting the political process from distortions caused by false or inaccurate statements justified the sanction. The Court concluded that, absent a showing that the candidate made the disputed statement other than in good faith and with knowledge of its falsity, or that he made it with reckless disregard of its falsity, the sanction "was inconsistent with the atmosphere of robust political debate protected by the First Amendment."

*Chmura*, 608 N.W.2d at 40–41 (quoting *Brown*, 456 U.S. at 62, 102 S.Ct. 1523).

As in *Brown*, the Supreme Court of Michigan in *Chmura* observed that

> Canon 7(B)(1)(d) attaches adverse consequences to a candidate's statements that are not knowingly false or made with reckless disregard for truth or falsity. The canon applies to any statement that the candidate "reasonably should know is false, fraudulent, misleading, [or] deceptive." It also applies to a statement that "contains a material misrepresentation of fact or law," and a statement that

"omits a fact necessary to make the statement considered as a whole not materially misleading." It further prohibits a statement that is "likely to create an unjustified expectation about results the candidate can achieve."

608 N.W.2d at 41. In holding the canon facially unconstitutional, the *Chmura* Court explained that

> Canon 7(B)(1)(d) greatly chills debate regarding the qualifications of candidates for judicial office. It applies to all statements, not merely those statements that bear on the impartiality of the judiciary. A candidate for judicial office faces adverse consequences for statements that are not false, but, rather, are found misleading or deceptive. Further, the canon extends beyond the candidate's actual statement to permit discipline for factual omissions.

*Id.* at 42.

In so holding, the Supreme Court of Michigan "recognize[d] that the broad language of the canon is intended to promote civility in campaigns for judicial office." *Id.* at 43. "Nevertheless," the Supreme Court held that "the state's interest in preserving public confidence in the judiciary does not support the sweeping restraints imposed by Canon 7(B)(1)(d)." *Id.* "The prohibition on misleading and deceptive statements quells the exchange of ideas because the safest response to the risk of disciplinary action may sometimes be to remain silent." *Id.*

In this case, the court finds that the canon at issue, i.e., Canon 7B(2), appears to be more far-reaching than—or at least

---

**2.** It is worth mentioning that, as discussed in *Chmura*, only four states impose broad restrictions on a candidate's campaign speech. 608 N.W.2d at 37 n. 6. In addition to Alabama and Michigan, both Ohio and Georgia have adopted canons governing judicial conduct which restrict a judicial candidate in the type of statements he or she may make during an election campaign. *Id.* For example, Canon 7 of the Ohio Code of Judicial Conduct contains several provisions pertaining to a judicial candidate and judge's political campaign conduct. In particular, Canon 7 of the Ohio

Code of Judicial Conduct prohibits a judicial candidate from "[k]nowingly misrepresent[ing] his or her identity, qualifications, present position, or other fact or the identity, qualifications, present position, or other fact of an opponent [.]" Ohio Code of Judicial Conduct, Canon 7B(2)(f) (effective July 1, 1995). Moreover, as noted in *Chmura*, the Georgia Code of Judicial Conduct, Canon 7(B)(1)(d), is nearly identical to the Michigan Code of Judicial Conduct. 608 N.W.2d at 38 n. 6.

on the same par with—the canon held unconstitutional in *Chmura* and the statute examined in *Brown, supra.* As in *Chmura* and *Brown*, Canon 7B(2) of the Alabama Canons of Judicial Ethics extends beyond those statements that are false or made with knowledge of their falsity to speech that a "reasonable person" would deem "deceiving or misleading." The "deceiving or misleading" clause of Canon 7B(2) neither takes into account the candidate's intent nor does it contain a falsity requirement. Therefore, if a "reasonable person" would deem "true information" either "deceiving or misleading," the candidate violates Canon 7B(2) and, thus, is subject to being charged by the JIC for a violation thereof. Further, if the candidate is already serving as a judge, like Justice See, he or she is at risk of being disqualified from service during the pendency of the JIC complaint pursuant to Amendment No. 328, § 6.19, to the Alabama Constitution of 1901. In other words, a violation under the "deceiving or misleading" clause of Canon 7B(2) can occur, regardless of whether the candidate acted with knowledge of or in reckless disregard to the "deceiving or misleading" nature of the otherwise "true information." The same type of scenario was present in *Brown.*

The Supreme Court in *Brown* explained that a candidate's liability under the statute before it "is absolute: [The appellant's] election victory must be voided even if the offending statement was made in good faith . . . . ." 456 U.S. at 61, 102 S.Ct. 1523. "The chilling effect of such absolute accountability for factual misstatements in the course of political debate is incompatible with the atmosphere of free discussion contemplated by the First Amendment in the context of political campaigns." [3] *Id.*

Here also, as in *Brown*, the "deceiving or misleading" portion of Canon 7B(2) does not allow for erroneous but unintentional or innocent statements.[4] As a result, it has the potential to squelch free speech by inhibiting candidates from speaking for fear of violating the canon and being disciplined. Without an intent element or falsity requirement, candidates risk violating the canon for mistaken but innocent dissemination of "deceiving or misleading" information. Thus, rather than risk violating the canon, the candidate may choose to remain silent rather than exercise his or her freedom of speech. The court finds that such a result is unacceptable under the First Amendment. As stated in *Chmura*,

> [a] rationale for judicial elections is that meaningful debate should periodi-

**3.** The court notes that the *Brown* Court did not hold, but did suggest that, in scenarios like the one before it, it would employ the standard articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and permit regulation only of misstatements knowingly or recklessly made. *See Brown*, 456 U.S. at 61–62, 102 S.Ct. 1523. In *Sullivan*, the Supreme Court applied an actual malice test for libel to campaign comments by newspapers in order to foster full and open discussion of candidates in political elections. 376 U.S. at 284–84, 84 S.Ct. 710.

**4.** As further explained by the Supreme Court in *Brown*,

> [a]lthough the state interest in protecting the political process from distortions caused by untrue and inaccurate speech is somewhat different from the state interest

in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount. Whenever compatible with the underlying interests at stake, under the regime of that Amendment "we depend for . . . correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc., supra*, 418 U.S. at 339–340, 94 S.Ct. at 3006–3007. In a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent. The preferred First Amendment remedy of "more speech, not enforced silence," *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring), thus has special force. *Cf. Gertz v. Robert Welch, Inc., supra*, 418 U.S. at 344, 94 S.Ct. at 3009.

456 U.S. at 61.

cally take place concerning the overall direction of the courts and the role of individual judges in contributing to that direction. Such debate is impossible if judicial candidates are overly fearful of potential discipline for what they say. 608 N.W.2d at 42. Based on the foregoing, Canon 7B(2) does not appear to afford the "breathing space" required to overcome First Amendment scrutiny.[5] *Sullivan,* 376 U.S. at 271–272, 84 S.Ct. 710 ("[E]rroneus statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive.'") (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Accordingly, the court finds that there exists a substantial likelihood of success that Plaintiffs can prevail on the merits of this claim.

Second, Canon 7B(2)'s prohibition also appears to be overbroad for the same reasons articulated in *Iowa Right To Life Committee, Inc. v. Williams,* 187 F.3d 963 (1999). In *Williams,* which involved an appeal from a preliminary injunction, the Third Circuit examined, in part, the constitutionality of an Iowa campaign administrative code rule ("rule") which limited expenditures for "express advocacy" of candidates made independently of the candidate and his or her campaign. *Id.* at 968–69. The portion of the rule at issue provided that "express advocacy" constitutes communication that:

"b. When taken as a whole and with limited reference to external events such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) ... because:

(1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

(2) Reasonable minds could not differ as to whether it encourages action to elect or defeat one or more clearly identified candidate(s) ... or encourages some other kind of action."

*Id.* at 969 (quoting Iowa Admin.Code r. 351–4.100(1)(b)).

The Iowa Right To Life Committee, Inc. ("IRLC"), which publishes "voter guides" containing information about the political positions of elected candidates (*id.* at 965), argued that the rule's definition of "express advocacy" chilled its First Amendment rights "to public discussion of issues." *Id.* at 968. According to IRLC, the chilling effect occurred because the rule's definition of "express advocacy" was "unconstitutionally overbroad and swe[pt] in a substantial amount of protected speech, creating uncertainty." *Id.* In ar-

---

5. The court notes that Defendants cite a case decided by the Supreme Court of Ohio in support of their argument that Canon 7B(2) survives First Amendment scrutiny. (Def.s' Mem. at 4, citing *In re Complaint Against Harper,* 77 Ohio St.3d 211, 673 N.E.2d 1253, 1264–65 (1996)). In *Harper,* the Supreme Court of Ohio generally concluded that its canons contained in the Ohio Code of Judicial Conduct "do not prohibit truthful criticism, so long as the criticism is done fairly, accurately, and upon facts, not false representations" and, thus, held that its judicial canons as a whole "are not overbroad." 673 N.E.2d at 1265. Defendants assert that Canon 7B(2)(f) of the Ohio Code of Judicial Conduct "is similar to Alabama's canon prohibiting misrepresentations made by a judicial candidate regarding his or her opponent." (Def.s' Mem. at 4.) As stated, *supra,* in note 2, Canon 7B(2)(f) of the Ohio Code of Judicial Conduct prohibits a judicial candidate from "[k]nowingly misrepresent[ing] his or her identity, qualifications, present position, or other fact or the identity, qualifications, present position, or other fact of an opponent[.]" Ohio Code of Judicial Conduct, Canon 7B(2)(f) (effective July 1, 1995). For the following reason, the court disagrees with Defendants that *Harper* is relevant for purposes of the court's findings today. Namely, Canon 7B(2)(f) of the Ohio Code of Judicial Conduct does not contain language similar to the "deceiving or misleading" clause in the Alabama canon at issue in this action. Namely, Ohio's canon prohibits only falsehoods knowingly made and, thus, contains an "intent" element. Therefore, in short, 7B(2)(f) of the Ohio Code of Judicial Conduct is not helpful to Defendants for purposes of opposing the instant Motion.

guing that the definition was overbroad, IRLC focused on the language in the rule pertaining to "what reasonable people or reasonable minds would understand by the communication." *Id.* at 969. IRLC contended that, under this aspect of the definition, "[t]here [was] no way for IRLC to know ahead of time whether its speech does or does not meet the definition and therefore subjects them to government reporting and disclosure requirements." *Id.* According to the IRLC, "[t]he possible intent and effect attributed to the speech creates uncertainty." *Id.*

In affirming the lower court's decision, the Third Circuit held "that the State's definition of express advocacy created uncertainty and potentially chills discussion of public issues" and, thus, "there is a likelihood of success on the merits." *Id.* at 970. The Third Circuit explained that, where an interpretation of a definition of a statutory or regulatory phrase involves "[q]uestions of intent and effect," the speaker cannot "safely assume how anything he might say would be understood by others." *Id.* at 969 (citing *Buckley,* 424 U.S. at 43, 96 S.Ct. 612). "A speaker should not be put 'wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.'" *Id.* (quoting *Buckley,* 424 U.S. at 43, 96 S.Ct. 612). Thus, "[w]hen a definition depends on the meaning others attribute to the speech, there is no security for free discussion because the definition 'blankets with uncertainty whatever may be said,' requiring 'the speaker to hedge and trim.'" *Id.*

Accordingly, the Third Circuit held that the district court did not abuse its discretion in granting a preliminary injunction in favor of IRLC. *Id.* at 970. Specifically, the Third Circuit held that the district court did not err in finding that the IRLC "would likely succeed on the merits in its action to have the regulation declared unconstitutionally overbroad because it chills legitimate First Amendment rights to public discussion of issues." *Id.* at 966, 970.

The court recognizes that the rule at issue in *Williams* regulated a different aspect of political speech than the Canon at issue in this case. Nevertheless, the court finds that the reasoning in *Williams* is pertinent to the issues presented in this case. Here, in order for a candidate to know whether he is disseminating "true" but "misleading or deceiving" information, as prohibited by Canon 7B(2), he or she is at the mercy of what a "reasonable person" would think. The candidate must go inside the mind of a "reasonable person" to ascertain what inferences a reasonable person would or could draw from the candidate's advertisement.

Determining who represents a "reasonable person" is just one of the problems evidenced by Canon 7B(2). Even if it were clear as to who is a "reasonable person," further difficulties arise in ascertaining when the dissemination of "true information" should be deemed "deceiving or misleading" by that "reasonable person." Could not even reasonable, fairminded individuals differ and reach diametrical conclusions as to what types of information, although technically true, are "deceiving or misleading"? What is "deceiving or misleading" to one reasonable person may not necessarily be "deceiving or misleading" to another reasonable person. In other words, a judicial candidate cannot know ahead of time by reading Canon 7B(2) what types of information may fall within Canon 7B(2)'s "deceiving or misleading" proscriptions. Such broad proscriptions appear to be exactly the kind prohibited by the First Amendment to the United States Constitution. *See Buckley,* 997 F.2d at 230 ("A statute that forbids, or can fairly be read to forbid, privileged speech is not saved by the fact that it also forbids unprivileged speech and could in application be confined to the latter."); *see also Beshear v. Butt,* 863 F.Supp. 913, 916–17 (E.D.Ark.1994) (finding that an Arkansas judicial canon that prohibited a judicial candidate from "announc[ing] views on disputed legal or political issues" was "substantially overbroad and vague" and

noting that "[t]ruly, a judicial candidate striving diligently to conduct a campaign that is consistent with the canons, without the benefit of any specific standards as a guide, would in all likelihood refrain from expressing his views, while permissible under the First Amendment, in order to avoid the risk of a probable cause hearing likely to result in a public reprimand . . . ."). Consequently, the court finds that there exists a substantial likelihood of success on the merits on Plaintiffs' facial challenge to Canon 7B(2).

Third, neither Party has suggested any method by which Canon 7B(2) could be read narrowly so as to comport with the First Amendment. The lack of argument on this point is understandable. No Alabama court has interpreted this canon; thus, the court cannot look to state law for guidance as to the construction of the "misleading or deceiving" clause of Canon 7B(2). Moreover, while a federal court cannot interpret a state law so as to bind a state court, *see Buckley v. Illinois Judicial Inquiry Bd.*, 997 F.2d 224, 229 (7th Cir.1993), this court nonetheless can conceive of no way, without rewriting the canon, to limit the construction and narrow the canon's proscriptions. However, the court emphasizes that it is not at liberty to rewrite the canon, even if it desired to do so. *Id.* at 230. As stated by the Seventh Circuit in *Buckley*, it was not the court's "proper business to patch up" the state judicial canon. *Id.* The Seventh Circuit continued: "A 'savings' construction . . . would cast us in the role of a Council of Revision empowered to make such changes in a proposed enactment, state or federal, as might be necessary to render it constitutional. We are not authorized to play such a role." *Id.* Therefore, once again, the court finds that Plaintiffs are likely to succeed on the merits on their challenge to Canon 7B(2).

Fourth and finally, the court emphasizes that time and time again the Supreme Court of the United States has reaffirmed the importance of the First Amendment to the electoral process. In numerous cases, the Supreme Court has strictly scrutinized and invalidated laws imposing restrictions on the conduct of campaigns. For example, the Supreme Court has struck down statutory restrictions on the amount of money a candidate may spend campaigning for office. *See Buckley*, 424 U.S. at 19, 96 S.Ct. 612. ("A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached."). Similarly, in *Federal Election Comm'n v. National Conservative Political Action Comm.*, the Supreme Court struck down a statute limiting the amount of money an independent political committee can spend on behalf of a candidate seeking election. *See* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985); *see also Brown*, 456 U.S. at 45, 102 S.Ct. 1523, discussed *supra*.[6] In these decisions, and many others like them, the Supreme Court has relied on the strong presumption that First Amendment protections have little to do with the caliber and quality of the speech involved, but rather, the First Amendment is more concerned with the broad protection of the speech itself in order to encourage a robust exchange of ideas in political campaigns for elected office. Therefore, it appears that, short of using known or reckless falsehoods, candidates for judicial office may safely voice their opinions without shedding the cloak of protection provided under the First Amendment. *See, e.q., Sullivan*, 376 U.S. at 272–73, 84 S.Ct. 710 ("Where judicial

---

**6.** While the court recognizes that the aforementioned Supreme Court decisions are factually distinguishable from the case at hand in that they do not involve speech restrictions on judicial candidates, these decisions do involve analogous issues. Moreover, the cited decisions represent the Supreme Court's consistent endeavors to assure the broadest possible dissemination of views in political campaigns and are worth mentioning here for that reason.

officers are involved, this Court has held that concern for the dignity and reputation of the courts does not justify the punishment as criminal contempt of criticism of the judge or his decision. This is true even though the utterance contains 'half-truths' and 'misinformation.' ") (internal citation omitted) (quoting *Pennekamp v. Florida*, 328 U.S. 331, 342–343 n. 5, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946)). Accordingly, the court, again, finds that Plaintiffs have established a substantial likelihood of success on the merits on their claim.

In sum, based on the foregoing, the court finds that Plaintiffs have satisfied the first element for obtaining a temporary restraining order. Plaintiffs may likely succeed on a facial challenge to Canon 7B(2) on the ground that Canon 7B(2), as written, is overbroad and, thus, chills free speech. As a result, Plaintiffs are likely to succeed on the merits in their action to have Canon 7B(2) declared unconstitutionally overbroad because it chills legitimate First Amendment rights.

### B. *Irreparable Harm*

■ Similarly, the court finds that Plaintiffs have sufficiently established that they will sustain irreparable injury unless the instant Motion is granted. " 'It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction [or a temporary restraining order].' " *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (quoting *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981)); *see also Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). "So too, direct pe-

nalization ... of First Amendment rights constitutes irreparable injury" for the purposes of granting temporary injunctive relief. *Id.* (citing *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir.1978)) (holding that "[v]iolations of first amendment rights constitute per se irreparable injury"). In short, irreparable harm is not difficult to establish when the impairment of First Amendment rights is at issue.[7]

■ Here, Plaintiffs seek to establish irreparable harm by showing that their First Amendment freedoms have been and will continue to be violated because of Defendants' enforcement of Canon 7B(2) of the Alabama Canons of Judicial Ethics, and Amendment No. 328, § 6.19, to the Alabama Constitution of 1901. In support thereof, Plaintiffs assert that "potential candidates and voters are being irreparably harmed by the inescapably chilling effect that JIC's enforcement of Canon 7B(2) has on the discussion of judicial issues." (Pl.s' Br. at 7.) Further and more importantly, Plaintiffs allege that Justice See has suffered and is presently suffering irreparable harm because of the penalty he has received for using speech that is patently protected under the First Amendment. In other words, Plaintiffs claim that Justice See is being punished for exercising his rights to freedom of speech, and this punishment, according to Plaintiffs, constitutes irreparable harm to Justice See.

The punishment Plaintiffs refer to is Justice See's disqualification "from acting as a judge," pursuant to § 6.19 of Amendment No. 328 to the Alabama Constitution of 1901. (Compl.¶ 17.) There is no question that said punishment was the direct result of Justice See's use of allegedly protected speech. Stated differently, it is undisputed that Justice See's current disqualified status is the direct consequence of his remarks about Judge Moore.[8]

---

7. Indeed, some federal courts have held that irreparable injury justifying injunctive relief is simply presumed to the extent that an infringement of First Amendment rights is established. *See Community Communications Co., Inc., v. City of Boulder, Colo.*, 660 F.2d 1370 (10th Cir.1981), cert. dismissed, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982).

8. In opposing the instant Motion, Defendants contend that Plaintiffs fail to establish irreparable harm. (Def.s' Mem. at 6–7.) In support of this contention, Defendants assert that Justice See is no longer in the race for Chief

Plaintiffs maintain that these remarks are protected speech under the First Amendment and that Justice See's punishment resulting from said remarks is unconstitutional. Moreover, Plaintiffs claim that the state laws authorizing Justice See's punishment and causing the alleged "chilling effect ... on judicial issues" are unconstitutional. (Pl.s' Br. at 2–7.) Because the court finds that Plaintiffs have established a substantial likelihood of success on the merits on at least one of Plaintiffs' claims, *see supra* Part III.A, and because "direct penalization ... of First Amendment rights [unquestionably] constitutes irreparable injury," the court finds that Plaintiffs have adequately established irreparable harm justifying the grant of a temporary restraining order. *Cate,* 707 F.2d at 1188; *see also American Civil Liberties Union,* 744 F.Supp. at 1099 (stating that "any loss of first amendment freedoms ... can constitute irreparable injury"); *Johnson,* 586 F.2d at 995 (holding that "[v]iolations of first amendment rights constitute per se irreparable injury").

### C. *Balance Of Harm*

Should the court grant Plaintiffs' Motion For A Temporary Restraining Order, the only harm that would accrue to Defendants would be a delay in their ability to prosecute and seek sanctions against Justice See in the Court of the Judiciary. On the other hand, the court finds that the serious loss of First Amendment freedoms allegedly suffered by Justice See constitutes an inordinate amount of harm to him. This, coupled with the fact that Justice See, a duly elected official, is currently precluded from carrying out the vital obligations he has assumed as an Associate Justice of the Supreme Court of Alabama, leads this court to conclude that greater injury will be inflicted upon Justice See by the denial of the instant Motion than would

be inflicted upon Defendants by the granting of said Motion.

### D. *Affect On Public Interest*

Finally, the court finds that the public interest will not be adversely affected by issuance of a temporary restraining order in this case. To the contrary, public interest is well served when the application of potentially unconstitutional laws is enjoined and when duly elected officials are not hindered from performing their duties by such laws. This is especially true when, as here, the core principles of the First Amendment are at issue. Accordingly, the court is satisfied that public interest will not be disserved by the granting of Plaintiffs' Motion.

## IV. CONCLUSION

Based on the foregoing, the court finds that Plaintiffs' Motion For A Temporary Restraining Order is due to be granted with respect to Justice See and denied as moot with respect to Judge Gaither and Butler. With this said, the court strongly emphasizes that its decision today does not mean that Plaintiffs have proven their case. The court has not attempted to address every point advanced by both sides; rather, the court has merely articulated the reasons why temporary injunctive relief is appropriate at this early stage of the proceedings.

As stated, this is no easy matter and the court is extremely hesitant to predict the ultimate outcome. More briefing is expected and the court will carefully consider this case before making a final determination on the merits. However, based on the foregoing discussion, the court concludes that the interests of justice and equity are best served by the issuance of a temporary restraining order in this case.

---

Justice of the Supreme Court of Alabama and that he will not be suspended any longer than necessary because the JIC's complaint against him "will be heard as quickly as possible." (*Id.* at 6.) However, Defendants ignore the fact that Justice See is now being directly

penalized for the use of allegedly protected speech and that the Eleventh Circuit has held that such penalties constitute irreparable harm. *See Cate,* 707 F.2d at 1188. Accordingly, the court finds Defendants' contention unpersuasive.

## V. ORDER

Accordingly, pursuant to FED.R.CIV.P. 65(b), it is CONSIDERED and ORDERED that Plaintiffs' Motion For Temporary Restraining Order be and the same is hereby GRANTED in part as follows:

(1) A Temporary Restraining Order shall issue immediately and security in the amount of $1,000 shall be posted with the Clerk by Plaintiffs no later than 3:00 p.m. on July 28, 2000.

(2) Defendants are hereby ENJOINED and RESTRAINED, directly or indirectly, whether alone or in concert with others, including any officer, agent, employee, representative or attorney, until further order of the court from enforcing or attempting to enforce Canon 7B(2) of the Alabama Canons of Judicial Ethics.

(3) Defendants are hereby ENJOINED and RESTRAINED, directly or indirectly, whether alone or in concert with others, including any officer, agent, employee, representative or attorney, until further order of the court from prosecuting or attempting to prosecute the complaint against Justice See, filed July 21, 2000, which is pending before the Court of the Judiciary of Alabama.

(4) Defendants are hereby ENJOINED and RESTRAINED, directly or indirectly, whether alone or in concert with others, including any officer, agent, employee, representative or attorney, until further order of the court from hindering or preventing Justice See from continuing to carry out his duties as an Associate Justice of the Supreme Court of Alabama.

(5) This Order shall remain in full force and effect until such time as the court specifically orders otherwise.

It is further CONSIDERED and ORDERED that the relief requested by Judge Gaither and Butler in Plaintiffs' Motion For Temporary Restraining Order be and the same is hereby DENIED AS MOOT.

Finally, it is CONSIDERED and ORDERED that a hearing on Plaintiffs' Motion For Preliminary Injunction, filed July 24, 2000, and/or on the merits of the above-styled action be and the same is hereby set for Wednesday, August 2, 2000, at 11:00 a.m. in the first floor courtroom of the Frank M. Johnson, Jr. Federal Building and United States Courthouse located in Montgomery, Alabama.